HDM/MGD/DGR:PJC
F. #2021R00440

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

          - against -

HUILING WU,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION OF
THE UNITED STATES OF AMERICA FOR A
SEARCH WARRANT FOR THE PREMISES
KNOWN AND DESCRIBED AS 4821 8TH
AVENUE, BROOKLYN, NY 11220, AND ALL
LOCKED AND CLOSED CONTAINERS
LOCATED THEREIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST AND SEARCH WARRANTS

22-MJ-1293

(T. 18, U.S.C., § 1349)

EASTERN DISTRICT OF NEW YORK, SS:

JILLIAN HUSMAN, being duly sworn, deposes and states that she is a Special

Agent with the United States Department of Health and Human Services, Office of the Inspector

General ("HHS-OIG"), duly appointed according to law and acting as such.

In or about and between January and October 2022, both dates being approximate

and inclusive, within the Eastern District of New York and elsewhere, the defendant HUILING

WU, together with others, did knowingly and willfully conspire to execute a scheme and artifice

to defraud Medicare and Medicaid, health care benefits programs, as that term is defined under

Title 18, United States Code, Section 24(b), and to obtain, by means of one or more materially

1

false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, Medicare and Medicaid, in connection with the delivery of a payment for health care benefits, items and services, contrary to Title 18, United States Code, Section 1347.

(Title 18, United States Code, Section 1349)

The source of your deponent's information and the grounds for her belief are as follows:

1.      I make this affidavit in support of an application for an arrest warrant for the defendant HUILING WU and in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known and described as 4821 8th Avenue, Brooklyn, New York 11220 (the "SUBJECT PREMISES"), as more fully described in Attachment A, for the things described in Attachment B, which constitute evidence, fruits and instrumentalities of health care fraud, in violation of Title 18, United States Code, Section 1347, paying illegal kickbacks and bribes, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B), conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, and conspiracy to defraud the United States and pay illegal kickbacks and bribes, in violation of Title 18, United States Code, Section 371 (the "SUBJECT OFFENSES").

2.      I have been a Special Agent with HHS-OIG for approximately four years. As an HHS-OIG Special Agent, I investigate health care fraud, including schemes to defraud Medicare and Medicaid and other health care benefit programs.   During my tenure with HHS-OIG, I have participated in a variety of criminal health care fraud investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, arranged consensually monitored telephone calls and video recordings, executed search warrants and

3

reviewed health care claims data, bank records, telephone records, medical records, invoices and other business records.   I am familiar with the records and documents maintained by health care providers and the laws and regulations related to the administration of Medicare and Medicaid and other health care benefit programs.

3.    I have personally participated in the investigation of the offenses discussed below.   I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities, and (c) information obtained from witnesses.

4.    Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge.   Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of search and arrest warrants, I have not set forth each and every fact learned during the course of this investigation.   Instead, I have set forth only those facts, in sum and substance and in part, which I believe are necessary to establish probable cause for the issuance of the search warrant and arrest warrant.

**PROBABLE CAUSE**

At all times relevant to this Application:

I.    The Defendant and the Relevant Entities and Individuals

5.    888 Pharmacy Inc. ("888 PHARMACY") was a retail pharmacy that operated within the SUBJECT PREMISES.   888 PHARMACY maintained a bank account ending in 2330 (the "888 PHARMACY Account") at Financial Institution-1, whose identity is

4

known to me.   The address on the 888 PHARMACY Account was that of the SUBJECT

PREMISES.

6.      The defendant HUILING WU was an owner and employee of 888

PHARMACY.   WU was a signatory on the 888 PHARMACY Account.

7.      Doctor-1, an individual whose identity is known to me, was a medical

doctor who specialized in podiatry and who was enrolled as a Medicare and Medicaid provider.

8.      Medical Practice-1, an entity whose identity is known to me, was a

podiatry practice in Flushing, New York.   Doctor-1 saw patients at Medical Practice-1.

9.      Doctor-2, an individual whose identity is known to me, was a medical

doctor who specialized in internal medicine and who was enrolled as a Medicare and Medicaid

provider.   Medicare claims data for claims submitted during the period from approximately

January 2018 to July 2022 showed that Doctor-2 ranked fourth among providers who signed

prescriptions that were billed to Medicare by 888 PHARMACY, based on the amount paid by

Medicare to 888 PHARMACY.

## II.   The SUBJECT PREMISES

10.      The SUBJECT PREMISES is a retail pharmacy located at 4281 8th

Avenue, Brooklyn, New York 11220.   It is located within the ground floor of an attached, two-

story brick building that has commercial units on the ground floor and apartment units on the

second floor.   The SUBJECT PREMISES is accessible through a glass door under a green

4

5

awning with "4821," "888 PHARMACY, INC/ [Chinese symbols]/FARMACIA" written on it.

The exterior of the SUBJECT PREMISES is depicted below:



III.    Medicare and Medicaid

11.    Medicare was a federal health care program providing benefits to persons who are 65 years old or disabled.   Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.   Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

6

12.    Medicare was divided into multiple parts.   Medicare Part B covered outpatient hospital services and professional services provided by physicians and other providers, including durable medical equipment ("DME").   Medicare Part C—also known as Medicare Advantage—offered beneficiaries the opportunity to secure coverage from private insurers ("Contractors") for many of the same services that were provided by Part B.   Medicare Part D provided prescription drug coverage to persons who were eligible for Medicare.

13.    CMS provided fixed, monthly payments to the Contractors for each beneficiary enrolled in a Medicare Advantage plan administered by the Contractors.   These monthly payments were referred to as "capitation" payments.   To obtain payment for treatment or services provided to a beneficiary enrolled in a Medicare Advantage plan, health care providers submitted itemized claim forms to the Contractors.

14.    Medicaid was a federal and state health care program providing benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care.   CMS was responsible for overseeing Medicaid in participating states, including New York State. Individuals who received benefits under Medicaid were referred to as "recipients."

15.    Medicaid was a health and long-term care coverage program jointly financed by states and the federal government pursuant to the Social Security Act of 1965.   Each state established and administered its own Medicaid program and determined the type, amount, duration and scope of services covered within broad federal guidelines.

16.    Medicaid covered the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled.

Service providers were authorized to submit claims to Medicaid only for services they actually rendered and were required to maintain patient records verifying the provision of such services.

17. In New York State, Medicaid provided coverage to its recipients for prescription drugs. Medicaid recipients could obtain their prescription drug benefits from pharmacies either through "fee-for-service" enrollment or through Medicaid Managed Care plans, which were administered by private insurance companies that were paid by Medicaid.

18. As part of their insurance benefits, some Medicare beneficiaries and Medicaid recipients received a certain amount of credit per month that could be spent on eligible over-the-counter ("OTC") non-prescription items such as analgesics, diabetes supplies, antihistamines, weight management supplies, sleep aids, vitamins, toothpaste, DME and other items. OTC money could not be spent on items such as cosmetics, hair care products, dry-skin lotions and perfumes. The monthly OTC credit was pre-loaded onto debit cards known as "over-the-counter cards" or "OTC Cards," which were issued to recipients by the plan sponsors. Any funds that were not used by the end of the month were forfeited, and the OTC Cards were reloaded each month with refreshed funds. Pharmacies generally dispensed OTC benefits to recipients by swiping the OTC Cards, like debit cards, through an electronic payment system.

19. Medicare, the Contractors and Medicaid were "health care benefit programs," as defined by Title 18, United States Code, Section 24(b) and referenced in Title 18, United States Code, Section 1347.

20. Pharmacies were typically required to submit claims electronically to Medicare, the Contractors and Medicaid in order to receive reimbursement.

21.    By submitting a claim to Medicare, the Contractors or Medicaid, the provider certified, among other things, that the services were rendered to the patient, were medically necessary and were not rendered as a result of kickbacks or bribes.

22.    New York State requires pharmacies to keep on file for six years signed prescriptions or fiscal orders for which Medicaid payments are claimed.   For deliveries of prescribed medications, delivery confirmation is required to be maintained by a pharmacy for six years from the date of payment.   In addition, under these rules, telephone orders from prescribers are required to be reduced to writing and to indicate the time of the call and the initials of the pharmacist.

23.    Pharmacists must also maintain for five years on the pharmacy's premises a log, either physical or electronic, reflecting the prescriptions that are dispensed each day, as well as a complete patient medication profile reflecting all medications dispensed to the patient within the last five years.

IV.    The Health Care Fraud Conspiracy

24.    In or about and between January 2022 and October 2022, the defendant HUILING WU, together with others, agreed to execute and executed a fraudulent scheme at 888 PHARMACY by which claims were submitted and caused to be submitted to Medicare, the Contractors, and Medicaid for the dispensing of pharmaceutical products and DME even though such items were medically unnecessary, procured by kickbacks and bribes and otherwise did not qualify for reimbursement.

25.    As part of the scheme, the defendant HUILING WU, together with others, regularly paid illegal kickbacks and bribes in the form of supermarket gift cards to Medicare beneficiaries and Medicaid recipients in exchange for the ability to bill Medicare, the Contractors

and Medicaid for prescription medications, DME and other services that were medically unnecessary, procured by kickbacks and otherwise did not qualify for reimbursement.

26.    In or about February 2022, HHS-OIG received an investigative referral related to 888 PHARMACY's claims for suspected medically unnecessary prescriptions, including alcohol pads, written by podiatrists.   During the period from approximately January 2018 through July 2022, Medicare prescribing data indicates that the top billed drug at 888 PHARMACY was Diclofenac Epolamine, a pain reliever, based on Medicare Part D amount paid.

27.    In or about and between January 2022 and October 2022, a confidential source[1] ("the CS"), an individual who was a Medicare beneficiary and Medicaid recipient and whose identity is known to me, was a customer of 888 PHARMACY.   During that time period, the CS filled prescriptions at 888 PHARMACY.

28.    On approximately January 14, 2022, the CS visited 888 PHARMACY where he/she was told by the defendant HUILING WU that he/she could receive $155 in supermarket gift certificates or in-store credit in exchange for his/her monthly OTC benefits and $2 in-store credit per prescription filled at 888 PHARMACY.

29.    On approximately January 20, 2022, the CS returned to 888 PHARMACY, and an employee made him/her a podiatry appointment with Medical Practice-1. The employee told the CS that he/she would see a non-Chinese doctor.   The employee told the CS that he/she could only exchange his/her OTC benefits for supermarket gift certificates if he/she also filled prescriptions at 888 PHARMACY.

---

[1] This source has been used extensively by HHS-OIG over a period of several years. His/her information has proven reliable and trustworthy and, as set forth below, is corroborated by other evidence obtained in the investigation to date.

10

30. On approximately January 28, 2022, the CS visited Medical Practice-1, where Doctor-1, who is not Chinese and saw the CS with the assistance of an employee who acted as a Mandarin translator, asked the CS about his/her feet. The CS, speaking Mandarin, denied having any pain in his/her feet, and the translator told the CS that he/she had to give Doctor-1 a reason to prescribe shoes. After discussing with the translator which ailments the CS might have that might qualify him/her for shoes, the CS told the translator, who then told Doctor-2 in English, that he/she has discomfort if he/she walks a lot. Doctor-1 remarked that the CS has flat fleet. The CS then visited 888 PHARMACY, where he/she was provided with three prescription medications prescribed by Doctor-1, including alcohol pads, as well as business cards for other medical providers, including Doctor-2. The CS was also provided with a voucher for pharmacy benefits written on a prescription label and a toothbrush as a "gift."

31. The CS was not charged a co-payment for the prescriptions dispensed to him/her on or about January 28, 2022, although in general a co-payment of approximately $3 would have been due for such prescriptions. In my training and experience, I have learned that a common means of providing kickbacks and bribes to Medicare beneficiaries and Medicaid recipients and facilitating fraud schemes for medically unnecessary medications is to fail to charge such individuals the co-payments due for their prescriptions. I therefore believe that 888 PHARMACY's failure to charge the CS co-payments for his/her prescriptions was a form of kickback and bribe and that such kickbacks and bribes were part of the overall health care fraud scheme taking place at 888 PHARMACY.

32. On approximately February 25, 2022, the CS visited 888 PHARMACY where an employee provided him/her with $155 in supermarket gift certificates in exchange for

11

his/her OTC benefits.   The employee told the CS that if he/she wanted to continue receiving gift cards in exchange for OTC benefits, he/she needed to ask doctors for prescription refills.

33.   On approximately March 24, 2022, the CS visited 888 PHARMACY where the defendant HUILING WU provided him/her with the three prescription medication refills prescribed by Doctor-1 and corresponding supermarket gift certificates for each prescription.   WU told the CS that he/she could receive new prescription shoes every six months if he/she were to enroll in a social adult day care.   WU also told the CS that he/she needed more prescriptions in order to continue receiving supermarket gift certificates, an illegal kickback and bribe, in exchange for his/her OTC benefits at 888 PHARMACY.   WU referred the CS to Doctor-2, provided him/her with business cards for 888 PHARMACY and Doctor-2 and instructed the CS to ask Doctor-2 for specific prescriptions: fish oil, eye drops, creams and stomach medications, despite the CS not needing these medications.   WU also provided the CS with an illegal kickback and bribe in the form of $155 in supermarket gift cards in exchange for his/her monthly OTC benefit.

34.   In my training and experience, I have found that pharmacies that provide similar kickbacks and bribes in exchange for the use of patients' monthly OTC benefits often retain their customers' OTC cards on their premises, although 888 PHARMACY did not do so in this instance.

35.   On approximately April 21, 2022, the CS visited Doctor-2.   The CS told Doctor-2, in Mandarin, that 888 PHARMACY referred him/her to Doctor-2 in order receive his/her monthly OTC benefit and that 888 PHARMACY recommended he/she be prescribed eye drops and stomach medications.   Doctor-2 asked the CS about his/her medical history, and when the CS told Doctor-2 that he/she did not take prescription medications, Doctor-2 laughed and

said, in sum and substance, that was "problematic." Doctor-2 briefly touched the CS's feet but otherwise did not conduct a physical examination. The CS asked Doctor-2 to prescribe medications that he/she could pick up that day, and Doctor-2 prescribed stomach and eye medications, consistent with what the CS told Doctor-2 that the defendant HUILING WU had recommended and even though the CS did not tell Doctor-2 that he/she had stomach or eye problems that required medication. Doctor-2 told the CS to pick up prescriptions at 888 PHARMACY.

36. When the CS returned to 888 PHARMACY, he/she was given the same three prescription medications previously prescribed by Doctor-1, including alcohol pads, and three additional prescription medications prescribed by Doctor-2, which included eye drops, a heartburn medication and Vascepa, a cholesterol medication, despite the CS telling Doctor-2 that he/she did not have cholesterol problems or heartburn. According to Medicare claims data I have reviewed for the period between approximately January 2022 and October 2022, Vascepa was the most billed drug among 888 PHARMACY customers. While at 888 PHARMACY, the CS also was provided an illegal kickback and bribe in the form of $155 in supermarket gift certificates in exchange for the use of his/her OTC benefits and received a bar of soap as an extra "gift."

37. On approximately October 28, 2022, the CS visited 888 PHARMACY. The CS had previously filled prescriptions at 888 PHARMACY and received store credit for each prescription, which was written as vouchers on prescription labels. The CS exchanged his/her previously obtained store credit for several items available for purchase within 888 PHARMACY. The CS also inquired about exchanging his/her monthly OTC benefit for

13

supermarket gift certificates, but he/she was told that since he/she had not filled prescriptions at 888 PHARMACY recently he/she could not exchange OTC benefits for other non-eligible items.

38.     On numerous occasions that the CS was present at 888 PHARMACY, he/she observed 888 PHARMACY employees using computers to carry out 888 PHARMACY's business, including to process and verify prescriptions.   For example, on or about February 25, 2022, the CS observed 888 PHARMACY employees using a computer while interacting with customers.   Those employees were also standing in front of a large wall of what appeared to be medical files.   The CS made similar observations on March 24, 2022 when he/she visited 888 PHARMACY.

39.     Based on my training and experience, including my investigation of 888 PHARMACY and other pharmacies providing illegal kickbacks and bribes in the form of cash or gift certificates in exchange for OTC benefits, this conversation between the CS and an 888 PHARMACY employee suggests a quid pro quo with pharmacy customers whereby a kickback is provided in exchange for prescriptions that are filled at the pharmacy.

40.     In and between December 2019 and November 2021, the 888 PHARMACY Account wrote numerous checks totaling more than $85,000 to a supermarket.

41.     Based on my training and experience, and information obtained through this investigation, including the CS's observation that 888 PHARMACY has computers in the pharmacy area and uses them when dealing with customers and the fact that similar investigations into pharmacies engaged in similar conduct have involved the use of computers, I believe that 888 PHARMACY uses computers to track its customers' medical records and prescription medications, including records of the prescribing medical provider.   Based on my training and experience, including investigations into other pharmacies engaged in health care

14

fraud and illegal health care kickback and bribe schemes, these electronic records include information related to billing, co-payments, dispensed OTC benefits and balances, prescription refills and whether a pharmacy received a prescription via phone or electronic submission. 888 PHARMACY and other similar pharmacies also use an electronic payment system to charge Medicare beneficiaries and Medicaid recipients' monthly OTC benefits, which may be capable of generating a transaction log.

42.     Based on my training and experience, including my investigation of other pharmacies that have paid illegal health care kickbacks and bribes to Medicare beneficiaries and Medicaid recipients to induce them to fill prescriptions at the pharmacy, the scheme is carried out through a referring relationship with a medical provider who is financially compensated for providing prescriptions that the pharmacy can bill to Medicare and Medicaid.

43.     Based on the foregoing, there is probable cause to arrest the defendant HUILING WU for conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, based on, among other things, her payment of illegal kickbacks and bribes in the form of supermarket gift certificates in exchange for OTC benefits and store credit for prescriptions filled at 888 PHARMACY on multiple occasions, her referral of the CS to Doctor-2 for specific prescriptions for medications that were not medically necessary, which were then provided to the CS and subsequently filled by 888 PHARMACY, and the fact that other 888 PHARMACY employees similarly paid illegal kickbacks and bribes to the CS.

44.     Based on the foregoing, there is probable cause to believe that evidence, fruits and instrumentalities of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES, including but not limited to records related to prescriptions filled at 888 PHARMACY, supermarket gift cards, financial records related to the reimbursement for claims

15

submitted to Medicare and Medicaid for the dispensing of prescriptions that were obtained

through the payment of illegal health care kickbacks and bribes, the waiving of co-payments for

prescriptions and records regarding OTC disbursements.

V.    TECHNICAL BACKGROUND

45.    As described above and in Attachment B, this application seeks

permission to search for records constituting evidence, fruits or instrumentalities of the

SUBJECT OFFENSES enumerated here that might be found in the SUBJECT PREMISES, in

whatever form they are found.   One form in which the records are likely to be found, based

upon the information obtained in our investigation, is in the form of data stored on a computer's

hard drive or other storage media.   Thus, the warrant applied for would authorize the seizure of

computers and electronic storage media or, potentially, the copying of electronically stored

information, all under Rule 41(e)(2)(B).

46.    I submit that if a computer[2] or storage medium[3] is found on the

SUBJECT PREMISES, as anticipated based upon our investigation, there is probable cause to

believe those records will be stored on that computer or storage medium, for at least the

following reasons:

a.    Based on my knowledge, training and experience, I know that

computer files or remnants of such files can be recovered months or even years after they have

---

[2] For purposes of the requested warrant, a computer includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic or storage functions, including desktop computers, laptops, mobile phones, tablets, server computers and network hardware, as well as wireless routers and other hardware involved in network and Internet data transfer.

[3] A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded.   Examples include external hard drives, CDs, DVDs and flash drives.

been downloaded onto a storage medium, deleted or viewed via the Internet.   Electronic files downloaded to a storage medium can be stored for years at little or no cost.   Even when files have been deleted, they can be recovered months or years later using forensic tools.   This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten.   In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.   To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from the use of an operating system or application, file system data structures and virtual memory "swap" or paging files.   Computer users typically do not erase or delete this evidence, because special software is typically required for that task.   However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

17

e.      Based on the facts described above, and other evidence related to this investigation, I am aware that computer equipment was used to, among other things, generate, submit and store documents used in the above-described health care fraud scheme.

47.     As further described in Attachment B, this application seeks permission to locate not only electronic computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the computers were used, the purpose of their use, who used them, and when.   There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.   Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.   Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history and anti-virus,

18

spyware and malware detection programs) can indicate who has used or controlled the computer

or storage media.   This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence.   The existence or absence of anti-

virus, spyware and malware detection programs may indicate whether the computer was

remotely accessed, thus inculpating or exculpating the computer owner.   Further, computer and

storage media activity can indicate how and when the computer or storage media was accessed

or used.   For example, as described herein, computers typically contain information that log:

computer user account session times and durations, computer activity associated with user

accounts, electronic storage media that connected with the computer and the IP addresses

through which the computer accessed networks and the internet.   Such information allows

investigators to understand the chronological context of computer or electronic storage media

access, use and events relating to the crime under investigation.   Additionally, some information

stored within a computer or electronic storage media may provide crucial evidence relating to the

physical location of other evidence and the suspects.   For example, images stored on a computer

may both show a particular location and have geolocation information incorporated into its file

data.   Such file data typically also contains information indicating when the file or image was

created.   The existence of such image files, along with external device connection logs, may

also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular

phone with an incorporated camera).   The geographic and timeline information described herein

may either inculpate or exculpate the computer user.   Last, information stored within a computer

may provide relevant insight into the computer user's state of mind as it relates to the offense

under investigation.   For example, information within the computer may indicate the owner's

motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or

19

consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how the computers were used, the purpose of their use, who used them and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.   Whether data stored on a computer is evidence may depend on the context provided by other information stored on the computer and the application of knowledge about how a computer functions.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it and when, it is sometimes necessary to establish that a particular item is not present on a storage medium.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

48.      In most cases, a thorough search for information that might be stored on computers and storage media often requires agents to seize such electronic devices and later review the media consistent with the warrant.   In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.   Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the

20

data either from accidental or intentional destruction.   This is true because of the time required for examination, technical requirements, and the variety of forms of electronic media, as explained below:

a.      The time required for an examination.   As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site.   Analyzing electronic data for attribution evidence and conducting a proper forensic examination requires considerable time, and taking that much time on the SUBJECT PREMISES could be unreasonable.   Given the ever-expanding data storage capacities of computers and storage media, reviewing such evidence to identify the items described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements.   Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.   Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.   The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the SUBJECT PREMISES.   However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      The variety of forms of electronic media.   Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

21

49.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would authorize seizing, imaging or otherwise copying computers and storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.   The later review may require techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

50.     888 PHARMACY is a functioning company that may conduct some legitimate business.   The seizure of 888 PHARMACY's computers may limit 888 PHARMACY's ability to conduct any such legitimate business.   As with any search warrant, I expect that this warrant will be executed reasonably.   Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied.   Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of 888 PHARMACY so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of 888 PHARMACY's legitimate business, if any.   If, after inspecting the computers, it is determined that retaining some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

VI.     SPECIAL INSTRUCTION REGARDING REVIEW OF THE SEIZED MATERIAL

51.     With respect to law enforcement's review of the seized material identified in Attachment B, law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law

22

enforcement deems necessary to assist in the review of the seized material (collectively, the "Review Team") shall review, in the first instance, the seized material.

52.    If, during the review of the seized material, the Review Team finds potentially privileged materials,[4] the Review Team will: (1) immediately cease its review of the potentially privileged materials at issue; (2) segregate the potentially privileged materials at issue; and (3) take appropriate steps to safeguard the potentially privileged materials at issue. Nothing in this Affidavit shall be construed to require the Review Team to cease or suspend review of all the seized material upon discovery of the existence of potentially privileged materials within a portion of the seized material.

VII.    Request for Sealing

53.    I respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the instant application and search and arrest warrants.  This investigation is not known to the targets, who are currently at liberty, and it is respectfully submitted that sealing these documents is necessary

---

[4] The investigation has not revealed any information suggesting potentially privileged materials may be found at the SUBJECT PREMISES.  The discussion of such materials herein is included solely in an abundance of caution.

23

to prevent the targets from learning that a search warrant has been issued, and to thus prevent the

targets from avoiding arrest and prosecution and destroying evidence.

*Jillian Husman*

_____

JILLIAN HUSMAN
Special Agent, HHS-OIG

Sworn to before me by telephone this
 6th   day of December, 2022

*Robert Levy*
_____
THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

**ATTACHMENT A**

The SUBJECT PREMISES is a retail pharmacy located at 4281 8th Avenue, Brooklyn, New York 11220.   It is located within the ground floor of an attached, two-story brick building that has commercial units on the ground floor and apartment units on the second floor. The SUBJECT PREMISES is accessible through a glass door under a green awning with "4821," "888 PHARMACY, INC/ [Chinese symbols]/FARMACIA" written on it.   The exterior of the SUBJECT PREMISES is depicted below:



1

**ATTACHMENT B**

Particular Things to be Seized

1. All evidence, fruits and instrumentalities of violations of Title 18, United States Code, Section 1347 (health care fraud), Title 42, United States Code, Section 1320a-7b(b)(2)(B) (paying illegal health care kickbacks), Title 18, United States Code, Section 1349 (conspiracy to commit health care fraud), Title 18, United States Code, Section 371 (conspiracy to defraud the United States and pay illegal health care kickbacks) (the "SUBJECT OFFENSES"), involving the defendant HUILING WU, SINGMAY SIU, MOMNA YOUNAS and 888 Pharmacy Inc. ("888 PHARMACY") from October 2018 to present, and involving the submission of claims for reimbursement to Medicare, the Contractors or Medicaid and the payment of illegal kickbacks, including but not limited to:

(a) Documents constituting, concerning, or relating to payments to patients, in cash, store credit, supermarket gift certificates or otherwise, including cash; documents constituting, reflecting or memorializing store credit earned by 888 PHARMACY customers; gift certificates and other documents constituting, reflecting or memorializing stored or transferrable monetary value; ledgers and other documents identifying Medicare beneficiaries or Medicaid recipients; records reflecting payments made to Medicare beneficiaries or Medicaid recipients, including the amount and date of payments; records reflecting which 888 PHARMACY employees made any such payments; employee records that further identify 888 PHARMACY employees who have made payments to Medicare beneficiaries or Medicaid recipients; any receipts signed by Medicare beneficiaries or Medicaid recipients and any documents provided to Medicare beneficiaries or Medicaid recipients in connection with their filling of prescriptions at 888 PHARMACY;

2

(b)      Documents constituting, concerning, or relating to pharmacy patient files, bills, invoices, and claims for payment/reimbursement for services or items billed, provided, or alleged to have been provided to patients to include, but not limited to, reimbursement claim forms, explanations of medical benefits, dispensing orders, detailed written orders and prescriptions, prior authorizations and supporting materials, certificates of medical necessity, signature logs, dispensing logs, information from physicians concerning the patients' diagnosis, patient transportation records, supply purchases, and proof of delivery of services, items or equipment that were submitted by, 888 PHARMACY, or any representative acting on behalf of 888 PHARMACY, to a health insurance provider for reimbursement;

(c)      All business cards pertaining to medical providers, including but not limited to SINGMAY SIU and MOMNA YOUNAS;

(d)      All documents and correspondence constituting, concerning or relating to efforts to collect, or the decision to waive, co-payments and/or deductibles for individuals who filled prescriptions at 888 PHARMACY;

(e)      All correspondence and cancelled checks relating to notice of overpayment and request for refunds from a health insurance provider;

(f)      All correspondence to and from a health insurance provider to or from HUILING WU, SINGMAY SIU, MOMNA YOUNAS, 888 PHARMACY, or any of its employees or agents, including, but not limited to, manuals, advisories, newsletters, bulletins, and publications related to illegal health care kickbacks, referring relationships and the collection of co-payments;

(g)      All correspondence to and from patients regarding prescription drugs that are medically unnecessary, procured by illegal health care kickbacks and bribes, or

3

ineligible for reimbursement, and/or any health insurance or medical provider related to illegal health care kickbacks, referring relationships and the collection of co-payments;

(h)    All documents pertaining to and all correspondence to and from SINGMAY SIU and MOMNA YOUNAS;

(i)    All contracts, agreements, logs, lists or records related to any payments for medical professional services or referrals for such services, including but not limited to records of payment by the defendant HUILING WU, 888 PHARMACY or any other 888 PHARMACY employee to any medical provider, including SINGMAY SIU and MOMNA YOUNAS;

(j)    All documents pertaining to health care fraud, waste and abuse training received by any employee, owner or affiliated person of 888 PHARMACY;

(k)    All employee files and resumes of the defendant HUILING WU, 888 PHARMACY or any other 888 PHARMACY employee.   This may include, but is not limited to, time cards/time sheets, payroll records and any documents or computer files listing any and all employee names addresses, telephone numbers, professional licensing and background information for all current and former employees;

(l)    Over-the-counter cards kept on file for Medicare beneficiaries and Medicaid recipients;

(m)    Financial books and records, including but not limited to:

i.    bank accounts, money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, employee payment records, tax forms and records, and bonds or bond funds, including deposits and

4

disbursements, cancelled checks or draft electronic transfers, ledgers, loan statements, loan agreements;

ii.    credit card/ATM/debit cards, including but not limited to account statements and physical cards; and

iii.    receipts for anything of value provided to Medicare beneficiaries or Medicaid recipients who filled prescriptions at 888 PHARMACY;

(n)    All pharmacy records required to be maintained by federal, state or local regulation;

(o)    Computers[1] or storage media[2] that contain records or information (hereinafter "COMPUTERS") used as a means to commit the SUBJECT OFFENSES.   All information obtained from such COMPUTERS will be maintained by the government for the purpose of authentication and any potential discovery obligations in any related prosecution. For any COMPUTER whose seizure is otherwise authorized by this warrant, and any COMPUTER that contains or in which is stored records or information that is otherwise called for by this warrant:

i.    evidence of who used, owned or controlled the COMPUTERS at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

---

[1] A computer includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, servers and network hardware, such as wireless routers.

[2] A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded.   Examples include external hard drives, CDs, DVDs and flash drives.

5

browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs and correspondence;

ii.    evidence of software that would allow others to control the COMPUTERS, such as viruses, Trojan horses and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.    evidence of the lack of such malicious software;

iv.    evidence of the attachment to the COMPUTERS of other storage devices or similar containers for electronic evidence;

v.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

vi.    evidence of the times the COMPUTERS were used;

vii.    evidence of the COMPUTERS being remotely accessed or remotely accessing other computers;

viii.    passwords, encryption keys and other access devices that may be necessary to access the COMPUTERS;

ix.    documentation and manuals that may be necessary to access the COMPUTERS or to conduct a forensic examination of the COMPUTERS; and

x.    contextual information necessary to understand the evidence described in this Attachment.

all of which constitute evidence, fruits and instrumentalities of the SUBJECT OFFENSES.